Good morning. Welcome from the great state of Idaho. Thank you. It is a great state, isn't it? Yes. May it please the court, I'm John Kurtz and I represent the plaintiff and appellant, Dickinson Foods, Inc., in this case. Notwithstanding the fact that the court repeatedly and consistently stated that Dickinson's action in disassembling the freezer did not justify a case terminating sanction and that the spoliation jury instruction was not a case terminating sanction, the court ultimately, in substance, imposed a case terminating sanction by granting summary judgment on Dickinson's CISG claim that the freezer was not able to meet its contract performance specifications, stating that the jury instruction decides the issue. When your client decided to remove the freezer, this would have been sometime around October of 17? Yes, Your Honor. Dickinson was suffering approximately $56,000 a day in profits. I'm just trying to fix the date. Oh, I'm sorry, the date of the removal? I'm just trying to fix the date. The date of the removal, I believe, was January 13, 2018. You'll do a lot better if you listen to the question before you answer. Thank you. Okay? All right. Good advice. From the time that your client announced an intention to the time of actual removal, did... Well, excuse me, excuse me. I'm still not done. Did your client explain to FPS why they were refusing to allow them to inspect pre-removal? Now I'm done. They did inspect pre-removal on numerous occasions. That's not my question. Did your client explain to FPS why it was denying pre-removal inspection? Yes or no? Not at the time of the removal or immediately prior to the removal. What occurred between the parties was set out in the various letters that we've cited in our brief. Yeah, that's all I wanted to know. Go ahead. I want to pick up on that because this is an unusual spoliation claim. Usually we get documents a little bit clearer. I'm somewhat sympathetic to your client's position that they have a freezer that's not working. It's impeding their business. They've got to do something with the freezer. However, it seems to me that, and I'd like you to address both of these, because it seems like there's two fundamental problems here with your client's position. Number one, your client wrote a letter and said, assuming that FPS was going to inspect it or take possession of the freezer after it was removed, and said, if you take possession of the freezer, you have to preserve it. So your client seemed to understand the duty to preserve the freezer even after it was removed. My second, and then I'll let you go on both. The second is you denied them the opportunity to come and inspect it. I understand that they didn't kind of come on your timetable, but the day before it was going to be removed, they wanted to at least come and observe the removal. You didn't allow it to happen, and then they never were able to actually come and inspect it until a year later. So help me walk through each of those and help me understand why that doesn't hurt your client's position here. Yeah, I appreciate that. In the letter that was sent on December 13th, 2017, advising that the freezer would be removed on January 13th, there was a statement in the letter that if they were to take over the freezer, that they would want to preserve it. So that letter was in there. Whether there was any real reason to preserve it probably was not true. I mean, the letter was written by a lawyer, and it was just, you know, an indication that perhaps that's a possibility. We don't believe that it was necessary to preserve the freezer based on all of the testing that was done before, based on everything that was known about the freezer. So with respect to that, it's not an issue. And I'm sorry, your second question was? The second question was why didn't you actually allow them to come and observe the removal? I mean, you were inspecting and doing tests like five days before the removal, and then you never allowed them either to observe the removal to determine whether this could be done in a way to avoid spoliation, and you never even allowed them to come in and test the freezer for about a year after it was removed. Well, they never asked to come in and test the freezer within a year. They didn't hire Eduardo Ford as an expert until September of 2018, almost nine months after the freezer had been removed. But, your Honor, I believe that this issue of whether they should have been able to inspect the disassembly of the freezer is really a red herring. No one has ever suggested they would have been able to see anything that would have been relevant to this case  Can I ask it this way? I don't know this business. I was struck, however, by the two different parts of the freezing operation, I'll say it that way. One was the freezer, and the other one was the refrigeration unit that went into the freezer, and those are apparently two different things. And part of the problem is trying to figure out where is the problem. Is the problem in the freezer, or is it in the refrigeration unit? Now, when you're disassembling it, I would have thought that maybe some evidence would emerge that would otherwise not be visible to the naked eye as to what the problem is. And so, if I'm the owner of the freezer, and the complaint is my freezer isn't working, I want to see how that thing is put together, and I'm probably not going to be able to see everything until it's taken apart. Because at that point, all the various connections and so on are in there, and at that point, maybe I'm going to see, you know what, it's not my freezer that's the problem, it's the refrigeration unit that's been put in there to operate in tandem with the freezer. So I desperately want to see it when it's being taken apart, because otherwise I can't see what's going on. And your client says, I will not allow you to do it. Why was your client saying, you can't see it, when I'm taking it apart? I think it was primarily concern that they were asked to have somebody from another company come and inspect it. They didn't ask to do it themselves. They asked to have somebody that they hired to come and inspect it. Sure, sure. And it's a huge freezer. Yeah. And it needed to be cut in half in order to be taken out of the building, just like it had to be cut in half before it went into the building. So they welded it when they first installed it, and they cut it in half to take it out. I think that the person who was in charge of overseeing what was going on, in terms of the removal of the freezer, was concerned about having some third party there that could be injured or anything like that. Did they give that as the reason? Well, that was part of it. Did they say that, we don't want you in there because it's going to be dangerous? No, there really was no communication about the reason to the freezer company. There really was no dispute. Pardon me for interrupting. There really was no dispute, or maybe to phrase it more accurately, there really was a dispute. FPS said the problem is the refrigerant, and Dickinson said it's the freezer. And throughout all of these inspections, that position remained pretty much the same, didn't it? That's correct. In fact, that in September of 2000, September 22 and 24 of 2017, FPS sent their representative freezer expert, Jim Peterson, to attend an economic summit, at which, because FPS was taking the position that they did not think that the freezer was operating correctly, according to the specifications of providing 210 tons of refrigeration, that Mr. Peterson had drafted in a report that he did in July of 2017. So Dickinson invited both Mr. Peterson as well as Mr. Kwok, who was the engineer for FPS, to come to an engineering summit where representatives of Nestle were there, Colmac was there, which is the company that installed the fins. I think we're familiar with all of that. It's in the record. There's a pretty detailed chronology. Here's my question. At the point in time that Dickinson said we're taking the freezer out, did FPS ever explain in any kind of detail what a pre-removal inspection would have revealed that all of these engineering summits and other inspections showed? Absolutely not. Absolutely not. And after the engineering summit was completed, FPS never showed up again at the site, never did any additional, quote-unquote, troubleshooting, as they argued. Nothing else was done. They were notified initially in July of 2017 that Dickinson was going to remove the freezer. They were then, after the economic summit, they received a letter from John Shufelt. Engineering summit. Engineering summit. Sorry. Thank you. They received a letter from John Shufelt the day after the engineering summit offering to return the purchase price. Dickinson, on October 18th, wrote a letter back saying, no, we have serious damages and we're not going to accept what you did. Can we move a little bit to the remedy that the district court imposed? You phrased it as a death penalty. Did you or whoever was representing Dickinson at the time offer a, if you will, milder jury instruction? I don't remember that we specifically offered a jury instruction different than the one that FPS had proposed, but we, so I don't, I believe that's the case. To me, the district court, just to flush it out, the district court could have said, yes, I think there's spoliation and I'm going to instruct the jury that they may consider the fact of the denial of pre-inspection in reaching their verdict, but I'm not going to tell them that they must. Absolutely. And so that follows up my question. Did you offer a, for lack of a better description, a milder jury instruction? No, but we did tell the court that any jury instruction should be a non-rebuttable jury instruction. And then, of course, once the judge came down with the jury instruction that he did adopt, which we contend created a reversible paradox in that on the one hand, he said there was no bad faith, there was no basis for a case terminating sanction, and then he turns around and actually grants one that obviously became the case when the court granted summary judgment in favor. A follow-up question on that. One of the elements of prejudice that the district court relied on was that Dickinson's expert had had an extensive opportunity to inspect the freezer and issue a detailed report. Did your side ever suggest to the district court that a milder remedy for the failure to allow the inspection would be to tell Dickinson that they couldn't use that report at trial? Absolutely. That's exactly what we told the court. What we explained to the court, first of all, that Mr. Taylor's inspection that he did do was not only about 20 minutes of testing that he did. Secondly, he found that the testing that was done back in September of 2017 was the testing that he would really rely upon because it was so extensive in order to show that the refrigeration system was performing in accordance with contract specifications. We told the judge that. In fact, we even offered to the judge that we would not have Mr. Taylor testify about his test that he did do. So that, we thought, was the left answer. You've answered my question. Thank you. Thank you. Don't use any more of your time than you need to. Thank you. Do you want time for a rebuttal? You've got two minutes. I better take it. Thank you. All right. Thank you. Good morning, Your Honors. Elijah Watkins with the FPS. Here's the 600-pound gorilla in the room of this case. What would a pre-removal inspection of the freezer unit by your client have revealed that they didn't already know? A pre-removal inspection, Your Honor, would have done a couple things. I'm looking for a list. Yes, Your Honor. And it's a list that the district court put in its orders as well. We would have been able to rely on our own data as opposed to relying on the data of FPS and FPS's people. But your own experts have been at the scene on these inspection summits or whatever with suppliers of Dickinson, with experts from your client's point of view. That happened, what, three, four times?  I know what the district court found. I'm just asking you, wasn't it true that over an extensive period of time, I think it started in July of 2016, and it went until September of 2017, there were multiple opportunities for your client to find out why this freezer wasn't performing to Dickinson's expectations. And they concluded, and they may well have been completely right about this, that the fault was not with the freezer itself. It was with the refrigeration system, the refrigerant that was delivered to the unit. They knew that. So my question, again, is what would a pre-removal inspection have told your client that it didn't already know? It would have told us potentially the same things, but on the opposite side of the coin, that Mr. Taylor was able to inspect and get his information out. Clearly, a pre-litigation inspection was not sufficient for Dickinson. Otherwise, Dickinson wouldn't have hired Mr. Taylor. It was important to Dickinson to have a separate expert. But then why couldn't Mr. Taylor's expert report just not be used? Why wouldn't that be a sufficient sanction? It does seem like a harsh sanction here. Well, two responses, Your Honor. First, you can't un-ring the bell. So he can say, yeah, I won't put that in my report, but he can't un-know what he's already known. He was there. He inspected. He saw the freezer in its entirety. He saw the refrigeration system in its entirety, inspected it, and that's going to go into any testimony or any understanding he has of the case. Our expert was deprived of that opportunity. We simply don't have it. Here's the thing that troubles me, and I invite you to respond directly to it. There's a problem with the operation of this freezer, which was important to the operation of Dickinson's business. Your client supplies a product. It's important to them to maintain the credibility and integrity of that product. A jury was never allowed to determine which of you was right. It may well be that your client was 100% right that it was the refrigerant. It could be that Dickinson was 100% right that it was the unit itself. No jury was allowed to assess those facts, properly instructed or otherwise, and make that final determination. Tell me why that's wrong. Because the law empowers district courts with considerable discretion in controlling discovery. This is a discovery dispute. And so the district court was presented with the destruction of evidence. Interestingly, Dickinson does not challenge the fact that it cut the freezer in half, that it dumped it in the parking lot, all that. So can we take that seriatim because, like, please, was it understood that when it was going to be removed, it was going to become inoperable? Or was there a way to remove this? Maybe I'm asking the wrong party. Was there a way to remove this that it would be preserved? Presumably there was a way to remove it that it could have been preserved because they wrote a letter saying you would have had a duty to preserve it if you took over possession of it. There absolutely was, Your Honor. There absolutely was. And you're right. They recognized that there was a way to do it. I believe the record reveals and the testimony shows Dickinson was on a timeline. They needed to get this thing out fast because, as Mr. Kurtz said, they were losing money every day. So this was not a painstakingly bolt by bolt remove the freezer so it could be reassembled. They keep using the word disassembly. That's not the word the district court used. They used destroy. Disassembly connotates that you can reassemble the thing you disassembled. As soon as they cut it in half, it was over. That was destroyed. Not completely, Your Honor. In fairness to Mr. Kurtz, it did come in two sections and was welded together. They didn't just cut down the middle, though. They cut down the middle, and then they cut the stuff to the left and the right of the middle. They cut the pipes in the middle. And at that point, it was destroyed. It's not like it was destroyed two months later because it was sitting outside. It was destroyed at the time of removal. It was destroyed at the time of removal, and it became more destroyed as it sat in the weather and got weathered and infested with vermin. September of 2017, I think it was the 27th, Dickinson asked FPS to develop a plan for remediating the freezer in light of the data produced at the two engineering summits. Is that correct? Just yes or no, is that correct? No, it's not. And the reason it's not correct, it was not Dickinson that asked. I believe it was Nestle. And the word engineering summit, I don't know that that ever shows up in the record. It was people getting together, troubleshooting. But to your point, a letter was sent at that time, yes. A letter was sent to FPS saying, develop a plan. Tell us a plan on how we can fix this thing so it works to our expectations. Correct. Correct? Correct. Did your client ever respond? I believe we did, Your Honor. There was the July letter, so right before September, where Dickinson said, we are rejecting our acceptance. FPS responded and said, keep working with us. We then came out and inspected. Then there was the September letter that said, come up with a plan. Then there was more back and forth. Forgive me, I don't have it right in front of me, but that's when the October letter came out where Dickinson said, FPS, we want you to come out and disassemble the freezer and then store it. Either now or after argument, if you can find it, I want a record transcript citation. Certainly, Your Honor. Does that provide an answer to my question, which is whether FPS responded to the request for FPS to come up with a plan to remediate the problem with the freezer? Certainly, Your Honor. Certainly. I've got a variation on Judge Hawkins' earlier question. He asked, well, what would a pre-removal inspection have revealed that was not already known? My question is, what would an inspection, or maybe I should say observation, during the process of removal have revealed? Because the sanction order is entered because you were refused permission to observe the removal. So what could have been learned during the process of removal that you were prevented from learning? With respect, Judge Fletcher, my understanding is that the sanction removal was entered because Dickinson failed to preserve evidence and evidence was destroyed. That said, yes, in seeing the freezer removed, we would have been able to see the freezer essentially plugged in to the refrigeration infrastructure. And the record reveals this. There is a difference between what is on a blueprint and what actually happens in reality. In reality, you have the blueprint. You get there and you say, ah, we've got to move that pipe a foot to the left or whatever. That's essentially my question. That is to say, your client was prevented from seeing it as it was taken apart. So it never really knew exactly what it looked like in its full aspect as it was assembled. It might have been assembled incorrectly, but they couldn't tell. Precisely. Precisely. We didn't get to see it dissected. Did the district judge entering the sanctions say some version of that as to why he was entering the sanction? As I read the sanction order, it was more focused on simply the destruction of the evidence. That is to say that Dickinson cut the freezer in half and did what it did there and then re-plumbed or re-configured its refrigeration infrastructure. So the pipes that were plugged in the freezer are now different than the pipes that are plugged in the new freezer. So we don't know what... They couldn't tell how the thing was hooked up. Correct. Is there testing, as Judge Hawkins has mentioned, this is an unusual case as well because there was an enormous amount of testing. It's hard... We're not experts on this stuff, but it's hard to imagine what additional information could have come up. You pointed to some seen behind the scenes, but say they had removed it in a way that it was still operational. It's just sitting on a crate next to where the new freezer is installed. Would there have been an opportunity for you to test at that point and come up with information that would have been helpful to your case? Yes. Yes, and the district court found that and Mr. Ford testified to that as well. You can refurbish these things. So if the freezer was taken apart in a proper way, if FPS had been given the opportunity, as they were invited to, to remove and store the freezer, this is an $18 million lawsuit. FPS could have basically rebuilt a refrigeration infrastructure. The freezer was $18 million? The freezer was $1 million. They're suing us for $18 million. Oh, okay. They could have, for that kind of money, rebuilt the refrigeration infrastructure that the Blueprint said and plugged it in and say, see, that one works. What's wrong with yours? We were denied that opportunity. We could have run various tests on the freezer unplugged. We could have had a third-party testing facility test it. All those opportunities were taken away from us. In December of 2017, Dickinson filed suit, correct? Correct. Did FPS make a discovery request? We did, Your Honor. I think I know where the court's going as to why we didn't inspect sooner. This is an open-ended question. I don't know the answer. Yes, we did make a discovery request. That's how we got the inspection. So they filed in December. If I remember my dates correctly, after they first filed, we filed an answer. There was some back and forth there on a counterclaim. And then when we finally got to discovery in earnest, we filed discovery in July and October. In both of those, we asked, what has become of the freezer? Because, again, we were barred from entry. And then that's when they described that they had cut the freezer in half, taken out the parts, put it outside in the dirt parking lot, et cetera. We then followed up with an inspection, and we were inspecting within two to three weeks of that request. Is it correct that on January 10, 2018, Dickinson's counsel called FPS's outside counsel, and FPS's outside counsel did not object to the freezer's removal? Is that a fact? I'm not familiar with that fact, no, Your Honor. Okay. Perhaps the opposing side can help us with that. Certainly. The adequate notice issue was July, October, and December 22nd of 2017. There the district court found on the first two no adequate notice because this was talking about the freezer being disassembled and FPS doing the disassembly. So no adequate notice that Dickinson was going to destroy the freezer. And then as far as December 22nd, 2017, three days before Christmas, we have a Canadian company needing to come down to Sugar City, Idaho, with heavy equipment to remove a freezer that's bigger than a semi-truck and get it back up to Canada. The court just said that's untimely. Dickinson hasn't appealed the issue of whether or not that ruling on inadequate notice based on untimeliness was there or not, and it was not. Just a quick procedural question. How did this case shift from Judge Nye to a judge from the Court of International Trade? I think it was simply a matter of docket management. The district court in Idaho has a lot on its plate, and I think they had a good judge. A third of our cases are heard by judges outside of Idaho. But you bring up an interesting point, Your Honor. This is a case where you've had two judges on opposite sides of the country, Idaho and New York, essentially come to the same conclusion, which is Dickinson destroyed the freezer, Dickinson spoliated evidence. I want to fast-forward a little bit to the type of the sanction because I know that's important to the court in terms of severity. The district court painstakingly went through and looked at all possible options for a sanction, not once but twice. It did it in the spoliation order. It did it in reconsideration. It looked at dismissal and excluding evidence, not allowing the expert opinion to come in. And the district court said, no, that'd kind of be tantamount to a dismissal. The district court found no bad faith so said that's too harsh on Dickinson. On the other side of the coin, the court looked at a permissive jury instruction and said, well, if I enter a permissive jury instruction, that just lets Dickinson tell its own story unchecked by the discovery it destroyed. And so it was balancing the prejudices. There was at least one case, albeit from the Second Circuit, the Fujitsu case, which said on its facts that spoliation determination was too strong a remedy where there was an adequate opportunity to deal with the situation in advance. Correct? I believe that's what Fujitsu held, yes. Did the district court do anything other than say, I don't want to consider the Second Circuit? I think what the court did is it looked at binding precedent that it was subject to and found that bad faith, it found properly that bad faith is required for a dismissal and found no dismissal here. And, indeed, the case wasn't dismissed. The case continued on for another three and a half years after the court entered its spoliation order. There was discovery. The claim was dismissed, though, effectively. Out of four claims, there was potentially one claim that was dismissed. Fair enough, but it was the claim. I mean, I don't know. It seems to me it was the primary claim. It's a little disingenuous to say, well, it was just one out of four claims. Dickinson is the master of its complaint. On the face of the complaint, the court found a fact issue. It said, factually, Dickinson destroyed evidence, so I'm going to enter an order that factually the evidence would have been disfavorable to the spoliating party. Very common order for a district court to enter. But it was a death sentence to the case. It was a practical matter that the case was over as soon as that order was entered. Respectfully, I disagree, Your Honor. Dickinson had three other legal-based claims that Dickinson voluntarily withdrew for legal reasons. Those legal defects existed on the face of the complaint on day one when Dickinson filed its complaint. And certainly, Dickinson, the day after the court entered its ‑‑ Those were the preempted claims? Those are different. There were two preempted claims, the good faith and fair dealing and the express warranty claim. And there was promissory estoppel, which the court said, you've got an express warranty. You can't maintain promissory estoppel. That's not the district court's fault. That's not FPS's fault. That's Dickinson choosing which claims to ‑‑ But I think it goes to my point, which is the only viable claim was effectively dismissed. Again, with respect, Your Honor, we don't know that's exactly true because Dickinson had the ability to amend. Other claims. And indeed, they tried to do that with a design defect case, Idaho Consumer Protection Act case. The problem is that they didn't do that until two and a half years after they filed the complaint. And the court there found that such a late attempt to amend was untimely and prejudicial to FPS. Dickinson does not appeal the court's findings that those were untimely and prejudicial. So there's other grounds to affirm the district court. So for those reasons, if there's any other questions, the district court ought to be confirmed. Don't forget my record citation site. Certainly, Your Honor. FPS is a response. Certainly, Your Honor. Thank you very much. Thank you, Your Honors. Thank you. Thank you. First of all, with regard to the additional legal theories that were in this case, all of them were dependent upon having to prove that the contract did not comply, that the freezer did not comply with the contract specifications. So whether it's a breach of warranty or any other theory that was applied, they all had the same requirement of proof that had to be made. You had to show that the freezer did not comply with these contract specifications. What the jury instruction went to was simply the court saying, you jury must find that the contract complied with, that the freezer complied with contract specifications. So the jury instruction eliminated all the claims. This may be an unfair question, and if you don't want to answer it or you feel you can't answer it, please do not answer it. When Dickinson refuses FBS permission to come in and watch the removal and then refuses access afterwards, is it doing it on advice of counsel? I don't know, Your Honor. I don't know. Dickinson had in-house counsel. I never gave that advice. Were you involved in the case at that time? I was involved more later in the case after the original spoliation motion was entered. Personally, I was previously with another law firm at that time. I had been with her 40 years. So with respect to this issue of the observation of the removal, there was never a request. First of all, in answer to your question, yes, there was a telephone conversation that took place between Mr. Bollinger and Mr. Shufelt, and it's in the record, and I can give you the citations to the record if you'd like on where that is. It's ER-3229 to ER-3230, and it's docket 44. It's in the declaration of Mr. Bollinger, and it was never refuted, and that occurred, and what was said in the conversation occurred. There was never a request with regard to the removal that they would come in and do additional testing. They didn't ask to do any testing after the September 2017 engineering summit. But does that matter? It seems to me that the question is whether a duty to preserve evidence was there, and if a duty to preserve evidence was there, you had to preserve the evidence. And, you know, maybe that would have involved a more expensive removal or whatever, but if you had a duty to preserve it, it's hard to understand how you wouldn't have had a duty to preserve it. I understand that all this testing was done before, but at the end of the day, that's pre-litigation. Once litigation comes up, things have changed, you know. Well, first of all, we do have an extensive argument in our brief that Dickinson did discharge its duty to preserve the freezer by providing the three different notices that it did provide. Okay, that's fair. I mean, that's a separate question, but no one's doubting. I mean, you're not disputing that you had a duty to preserve the evidence. You're just saying you complied with it. We discharged the duty by giving them an opportunity to come in and do whatever it is they wanted to do, and they never once said there was anything that they wanted to do with respect to investigating the freezer or the refrigeration system after the September 2017 Economic Engineer Summit. So we believe that under a matter of law, under the Golke case, that we – That's a Second Circuit case? It's not a Second Circuit case. There is a Second Circuit case. The Golke case is a seminal case that's actually a Wisconsin Supreme Court case, but it has numerous citations in it from federal court cases, and it's the case that recognizes that you can discharge your duty to preserve evidence by giving adequate notice of your intent to take it out or to destroy the evidence, and if the other side does not do anything in response to that, they cannot – they are not entitled to a spoliation determination. But effectively, to rule for you on that issue, wouldn't we have to find that this was legal error by the – I mean, can we find abuse of discretion on the facts in that matter? We'd have to find almost the legal. I believe that it's not a clearly erroneous standard. I believe that it is a legal standard because the only evidence that you have on what occurred with respect to notice is either undisputed with respect to the telephone conversation with Mr. Shewalt, but it's the three letters that Dickinson sent, and it's the letters that were sent in response. And in our brief, we've discussed why it is that those notices in that brief, the notices that were given in the letters, were legally sufficient. The only thing that Judge Nye at the time, who was a judge, indicated with respect to the second letter was where he said that – here's what he said. Based on the statement, Dickinson cannot be said to have given notice of its impending removal and disassembly of the FPS freezer and refrigeration system by requesting that the parties work together to coordinate a date of FPSs for FPS to remove the unit. That is not something that precludes the conclusion that we gave an adequate notice. All he's saying is that. And that's not a basis for denying that we discharged our duty the way we did. Alternatively, the court also erred, we believe, by the way that it addressed that issue. First, on the duty to preserve, the court found that the legal standard was more subjective than objective. It is an objective standard. You can go through and see what Judge Nye said in his decision, and you can see that he is trying to assume what it is that FPS would have thought about that issue. But it's an objective standard. There's no court that I'm aware of that ever applied a subjective standard. Secondly, the court made a distinction between pre-litigation and post-litigation. And in his opinion, he put in a footnote that that was an appropriate standard. But when you read those cases, none of them are notice cases. They're all cases where they just simply didn't give enough time for an inspection. So he erred on that. Counsel, we appreciate the argument. We know this is an important case. I think we're done with our questioning. Thank you, Your Honor. We'll close it up. But we appreciate both counsel for your arguments in the case, and the case is now submitted.
judges: HAWKINS, FLETCHER, NELSON